## THE MOHEGAN.

(District Court, E. D. New York. February 4, 1899.)

1. COLLISION — CROSSING OF STEAMSHIP AND FERRYBOAT — CUSTOM TO IGNORE RULES.

A custom for ferryboats to yield their privilege in crossing to larger steamers, or of the latter to exact it, and take the right of way, contrary to the rules of navigation, is not a legal justification to a steamship for a failure to recognize the right of precedence of a ferryboat, resulting in a collision.

2. SAME—EVIDENCE CONSIDERED.

Evidence considered, and held to show that a steamship was out of her course, and in fault for a collision with a ferryboat.

This was a libel in rem by the New York & East River Ferry Company against the steamship Mohegan for damages for collision.

James J. Macklin, for libelant.

Carpenter & Park, for claimant.

THOMAS, District Judge. At 6:46 o'clock p. m. on the 24th day of December, 1897, the steamship Mohegan, whose length and beam were respectively 300 feet and 50 feet, cleared her pier, and started up the East river. The night was clear and dark. There was a strong breeze from the northwest, and a flood tide running about 5 miles per hour. She went under full speed, and through the water at the rate of about 14 miles per hour, until she was in the west channel, and at or somewhat above Seventy-Ninth street, New York, when signals were given to reduce the speed to half speed. At about this time she sighted off her port bow a tug and tow alongside, coming around from Horn's Hook and from the Harlem river, exchanged signals with such tug to go to the right, which signals were duly executed, and the vessels passed within 50 or 100 feet of each other. These signals thus interchanged, or the warning blast for the bend at Horn's Hook claimed to have been given by the Mohegan at Seventy-Ninth street, were not distinguished by any witness on the trial, save those on the Mohegan at the time. As the Mohegan approached that part of the East river which lies beyond the upper end of Blackwell's Island, she sighted Transfer Tug No. 2 coming out of the Harlem river between Horn's Hook and Little Mill Rock, and headed across the Mohegan's bows, and towards the east channel, which is that part of the East river lying east of Blackwell's Island. The captain, pilot, and quartermaster, in the pilot house of the Mohegan, testify that the Mohegan exchanged two whistles with No. 2, which gave the latter boat the right of way across the Mohegan's bow. The passenger, Gorham, in the pilot house of the Mohegan, did not hear these signals. The captain and deckhand on No. 2 state that none were given. All persons testifying for the libelant state that they heard no such interchange between the Mohegan and No. 2, and the evidence induces the finding that such interchange did not take place. However, Transfer No. 2 did pass across the entrance of the west channel, and across the bow of the Mohegan; and, as variously stated by those doing look-

out duty on the Mohegan, such crossing was made 50, 100, or 200 feet away from the Mohegan's bow. Thereafter the Mohegan proceeded out of the west channel, and at a point between Horn's Hook and the southerly end of Little Mill Rock, and probably somewhat eastward of a line drawn between such location, she struck just abaft her paddle wheel the ferryboat Haarlem, who was proceeding on her usual course from her slip on the eastern or Astoria shore to her slip at Ninety-Second street, New York. Although the persons on the Mohegan locate the collision at a point between Little Mill Rock and the power house on the Astoria shore, such location is removed too far from the usual and natural course of the ferryboat, and from the course pursued by the Haarlem on the night in question, as appears from abundant evidence, to permit the court to adopt the claimant's contention in that regard. The evidence is that Transfer No. 2 passed under the stern of the Haarlem, that the Haarlem blew one whistle to the Mohegan as she was crossing No. 2's bow, and that No. 2 crossed the bow of the Mohegan at a distance variously estimated at from 50 to 200 feet by the witnesses for the Mohegan. The evidence preponderates that at this time the Haarlem was on her usual course, and that Transfer No. 2 was passing on the usual course from the Harlem river down and through the Gate into the east channel. How would it be possible, under such circumstances, for the Mohegan to collide with the Haarlem at the point indicated by the Mohegan's witnesses? The distance up the river from a straight line between Astoria ferry and Ninety-Second street to the point where the pilot of the Mohegan says that the Haarlem was when she gave the two whistles is about 240 feet, while the captain of the Mohegan makes it 15 feet; and the latter states that the Mohegan at this time was 945 feet below the line, and according to the pilot of the Mohegan the Haarlem must have been 405 feet off her course up the river when she gave one whistle (the captain of the Mohegan makes it 171 feet), and at the same time, according to the pilot, the Mohegan was 375 feet below the Haarlem's usual course, while the captain makes it 414 feet. By the evidence of the pilot, the collision must have taken place 780 feet up the river from the Haarlem's usual course, while the captain places it at 528. There are many reasons for believing that these statements cannot be upheld, especially in view of the fact that the Haarlem passed across the bows of Transfer No. 2, under the circumstances stated. How could the Transfer No. 2, passing from the Haarlem river to the east channel, have passed under the Haarlem's stern, if the Haarlem was at the time of the collision, which was shortly afterwards, 780 feet off her course up the river. The other locations appear to the court to be equally untrustworthy.

But the question most difficult of solution relates to the right of the Haarlem to pass ahead of the Mohegan, and that right depended (1) upon the Haarlem being in such a position on the steamer's starboard hand that the Mohegan should have given her the way; (2) upon the signals interchanged by the Mohegan and Haarlem. To solve these questions, a consideration of the evidence presented in a voluminous record is required. The evidence, so far as it is helpful, is derived from three

classes of witnesses: (1) Those on the Haarlem and her sister boat,
Bowery Bay; (2) those on the Mohegan; (3) those on Transfer No. 2.
The witnesses presenting the two last classes of evidence were called
by the claimant. The witnesses for the Haarlem, consisting generally
of the crews of the Haarlem and of her associate boat, the Bowery
Bay, which was lying 150 feet to the westward of Horn's Hook, and
600 feet from shore, waiting for the Mohegan to pass, testify to the
effect that when the Haarlem was about 400 feet from the Astoria
slip she blew one whistle to the Mohegan, which the Mohegan an-
swered with one; that as the Haarlem was passing into the western
tideway (the flood tide being interrupted and divided by an eddy with
a southerly set off the end of Blackwell's Island), Transfer Tug No.
2 blew the Haarlem one whistle to go across the latter's bow, which
the Haarlem crossed with two whistles, thereby claiming the right
to cross the bow of Transfer No. 2; that the latter yielded, and went
under the Haarlem's stern; that almost immediately the Mohegan
blew the Haarlem two whistles, which the Haarlem answered with one
whistle, and kept on her way, with the resulting collision heretofore
described. The persons on the Mohegan state that the Haarlem did
not at first give one whistle, that the Haarlem exchanged no signals
with Transfer No. 2; that Transfer No. 2 went across the Haarlem's
bow (the passenger, Gorham, on the Mohegan, states that the tug
went under the Haarlem's stern); that the Haarlem was lying still
outside her slip, and then started up, giving the Mohegan two whistles,
which the Mohegan answered with two; and that immediately the
Haarlem blew one whistle two or more times until the collision oc-
curred. The captain and mate of Transfer No. 2, called by the claim-
ant, state that, when the Haarlem was 300 or 400 feet from Transfer
No. 2, the latter gave the Haarlem one whistle to claim the right of
way; that the Haarlem answered with two whistles; that Transfer
No. 2 yielded, and went under the Haarlem's stern; that as the Haar-
lem was crossing the Transfer tug's bow, and a length and a half or
two lengths from her slip, the former blew one whistle to the Mohegan,
who answered with two whistles, to which the Haarlem answered with
one; and that the collision shortly thereafter happened. Omitting
for the moment the determination of the question whether the Haar-
lem first blew one whistle to the Mohegan, when the former was some
400 feet outside her slip, and disregarding chronological order, it ap-
pears that at least the following signals were given by the several ves-
sels:

Mohegan, 1 whistle to the tug and tow in the west channel, which was an-
swered.
Transfer No. 2, 1 whistle to the Haarlem.
Haarlem,       2     "     " Trans. No. 2 (possibly answered by No. 2).
Haarlem,       1     "     " the Mohegan.
Mohegan,       2     "     " " Haarlem.
Haarlem,       1     "     " " Mohegan (perhaps repeated).

Now as to chronological order: The following finding reconciles
all the evidence, save the libelant's evidence that the Haarlem blew to
the Mohegan before exchanging signals with Transfer No. 2. But the

captain and deckhand of Transfer No. 2 were disinterested and good witnesses, they were the nearest to the Haarlem, and the conclusion seems probable that this is the order of events: Transfer No. 2 gave one whistle to the Haarlem, and received two in return. That immediately or very shortly thereafter the Haarlem gave one whistle to the Mohegan, and heard at the same moment the Mohegan's one whistle to the tow in the west channel, and supposed that it was an answer; that the Mohegan heard the two whistles given by the Haarlem to the Transfer, and accordingly answered two, under the supposition that the signal was for the Mohegan; that the Haarlem immediately answered with one, and that the collision thereafter happened. This theory may be imperfect, but it accounts for the one whistle, and then two whistles from the Mohegan, which accords with the Mohegan's evidence, excluding the signals which some, but not all, of her witnesses think were exchanged between her and Transfer No. 2. It accounts for all the whistles which those on the Mohegan state were heard by them, viz. two whistles, then one whistle, excluding as before interchange between the Transfer No. 2 and the Mohegan. It accounts for all the whistles said to have been given and heard by those on the Haarlem and Bowery Bay, although not in the order stated by them. It accounts for all the whistles given and heard by the captain and deckhand on Transfer No. 2, although they are not certain but that the Transfer answered the Haarlem's cross signal to them. It reconciles all statements as to signals, save that of the witnesses for the Haarlem, to the effect that the Haarlem first blew one whistle; and indeed in one place the captain of the Mohegan states that the Haarlem blew one whistle as she was leaving her slip, but seems to have retracted the statement. She did indeed blow one whistle to the Mohegan, but it seems probable that it was given very shortly after exchanging signals with the Transfer No. 2. It now appears that the Mohegan ran into the Haarlem on her usual course at a point nearer to the line of the west shore, although the Haarlem had at all times been on the Mohegan's starboard hand, and was the preferred vessel; and although the Haarlem had, at a location hereafter to be considered, given the Mohegan a single whistle, which in the relative position of the vessels indicated that the Haarlem claimed the right of way. Reasoning back from a collision under such circumstances, the conclusion would be that the Mohegan was in fault, unless there was something in the Haarlem's actions, or the existing conditions, that should excuse the Mohegan for failing to comply with the rule and keep out of the Haarlem's way. It is suggested that all Astoria ferryboats were accustomed to yield to the Sound steamers, and not to attempt to enforce their privilege. This would imply that the Sound steamers were accustomed to domineer the situation, and hold in sway the preferred vessels, and that the latter did not venture to assert their privilege. Might may in fact enable a vessel to terrorize smaller craft, and thereby to obtain the way; but it can never give the burdened vessel the right of way, within the eyes of the law. Nor is it a better reason for disregarding the starboard-hand rule that steamers of the size of the Mohegan must have a certain headway through the Gate

to permit safe passage. It may be admitted that the Haarlem was more easily managed than the Mohegan, yet the former also was subject to the influence of the several sets of the tide, and the capacity of the Mohegan to resist the same successfully is shown by the fact that she was entangled with the Haarlem to Bounty Bay, and yet went through the Gate in her embarrassed condition, and thence successfully on her way. The contention that the Mohegan could not have stopped or slacked her speed in the west channel or in the river sufficiently to allow a ferryboat 145 feet in length to clear her, when in fact she only lacked some 75 feet of doing so, and that, too, on the westward side of the river, is not an acceptable claim. It may be true that a large steamer, proceeding at a speed that requires a half mile to stop, cannot be arrested in time to allow a ferryboat to cross in front of her according to a just right so to do; but this is because of the speed of the vessel, and not of any danger attending stopping or lessening speed. If a headway that cannot be ended in a half mile is necessary to the safety of such a vessel through the Gate, then it would be necessary to maintain it; but it appears from the very facts in this case that it is not necessary, and that accords with common knowledge on the subject. But what was the Mohegan doing so near the New York shore, and why could not she have gone under the stern of the Haarlem, which was so far to the westward at the time of the collision? It may well be admitted that if the collision took place, as stated by the claimant's witnesses, in the center of the river, away to the northeast, between Little Mill Rock and the power house, the Mohegan could not have gone with entire safety under the Haarlem's stern. As has been found, the probabilities do not favor the claim of the Mohegan. The evidence easily justifies a finding that the Mohegan was considerably to the westward of her usual course, and, so far as appears, without necessity, and that the Haarlem was on her usual course. If, now, the collision did occur toward the westerly side of the river, and south of the lower end of Little Mill Rock, as found heretofore, the conclusion is inevitable that the Mohegan could have gone under the Haarlem's stern, and that, too, safely; and, if she could have so done, she should have so done, for that was her usual course. This admits of demonstration. It appears by the evidence of Champlin, the pilot of the Mohegan, that he first saw the Haarlem immediately after blowing the warning whistle at Seventy-Ninth street, and perhaps as far up as Eighty-Fourth street, and that the Haarlem then was 250 or 300 feet out from her dock. If from that time on the Mohegan had pursued a course which would have brought her just to the eastward of Flood Rock, she would have crossed the usual and expectable course of the Haarlem in 1,650 feet; and if the Haarlem were 250 or 300 feet from her slip, when seen by the Mohegan's pilot, she would have crossed the course of the Mohegan in about 550 feet. Hence, the Mohegan had 1,650 feet to the Haarlem's 550 feet to travel to pass the point where their courses intersected. The Mohegan had reduced her speed to half speed at Seventy-Ninth street, or shortly thereafter. From Seventy-Ninth to Eighty-Fourth street is about 1,300 feet, and it is presumable that she had reduced meantime her former speed, where-

by she had covered above 5 miles in 16 minutes, with a flood tide running at the rate of 4 or 5 miles per hour. The usual speed of the Haarlem is about 7 miles per hour, and it is evident that she would have anticipated the Mohegan, and passed the point where the proper courses of the vessels intersected, as she had only one-third the distance to travel to effect this result. This must be so, or the Mohegan must have been entering the Gate with a headway of at least 21 miles per hour, which would condemn her. How is it this did not happen? Obviously, because the Mohegan was westward of her usual course. Her pilot admits as much. The evidence preponderatingly shows this, and she was westward of her course because she proposed to pass ahead of the Haarlem. The Haarlem is 145 feet in length, and the Mohegan struck her abaft her wheel. Hence, the Mohegan would have missed the Haarlem had she gone 70 feet to the eastward, and, as the collision occurred within about 400 feet of the line of the New York shore prolonged, the Mohegan had at least 800 feet of room to the eastward; and, even if the collision had been in the center of the river, an examination shows that the Mohegan had ample space to go under the Haarlem's stern. If the collision occurred at the point claimed by the Mohegan's pilot, it may be admitted that the Mohegan could not have gone under the Haarlem's stern, but, as has been shown, such location is indubitably erroneous and impossible. The conclusion as to the opportunity of the Mohegan to pass under the Haarlem's stern, irrespective of the question of signals, is substantiated by the evidence of the pilot of the Mohegan that if the Haarlem "had come out of her slip under the jingle bell, and kept her headway, she would have gone by us, if she had given us the proper whistle." From this the conclusion is deducible that the Haarlem had the right of way, and that she had sufficient room to go at full speed ahead of the Mohegan; and the only remaining question is, did the Haarlem mislead the Mohegan so that the latter was justified in believing that the Haarlem yielded?

The captain of the Mohegan testified as follows:

"Q. Supposing the Haarlem had given you one whistle at the time you say she gave you two, what would you have done to prevent collision? A. I would do just the same as I did do."

This evidence would indicate that the captain of the Mohegan considered that he had the right of way, whatever signals were given by the Haarlem, and that he was not influenced by such signals in adopting his maneuver. On the other hand, Champlin, the pilot of the Mohegan, seems to have regarded the Haarlem's signals as more influential in shaping the course of the Mohegan. The persons on the Mohegan seem to have supposed that the Haarlem's two whistles to Transfer No. 2 were intended for the Mohegan. It is very clear that they were not, and that this should have been apparent to the numerous navigators in charge of the Mohegan's wheel. As has been stated, when the Mohegan first sighted the Haarlem, the latter, by the evidence of the Mohegan's pilot, was 250 or 300 feet from her slip, and it appears by the Mohegan's evidence that the Haarlem was supposed to

be lying still until she blew this signal. The evidence is strongly pre ponderating that the Haarlem's two whistles and one whistle were very near together, and the evidence is reliable that the Haarlem was from 250 to 400 feet out when the whistles were given, and that the Mohegan was at or below Eighty-Fourth street at this time. The one whistle by the Haarlem under such circumstances was a timely warning to the Mohegan; for, if the Mohegan's course had been properly laid at that time, the vessels would have passed each other in safety, as has been shown above. But the Mohegan insists that she got and answered two signals to the Haarlem. It is certain that the Haarlem did not give the two whistles to the Mohegan, but to Transfer No. 2, and that the Mohegan misappropriated them. The captain of the Mohegan, as well as his associates, save Gorham, concluded that the Haarlem was lying still, and that Transfer No. 2 went across the Haarlem's bow; and the Mohegan's captain states that the Haarlem and Mohegan exchanged whistles about the same time that the Transfer No. 2 passed the Haarlem; that he did not know that the tugboat and Haarlem were exchanging whistles, and that if the Transfer No. 2 had stopped, and let the Haarlem go ahead, that would have told the captain of the Mohegan that there was an exchange of whistles between the ferryboat and the tugboat by which the tugboat yielded her right of way. Now, as a matter of fact, this precise thing did happen. Transfer No. 2 blew the Haarlem one whistle; the Haarlem answered with two. The Transfer yielded the right of way, and went under the stern of the Haarlem, so that the red light of the Haarlem was always in view, and the green light of Transfer No. 2 was hidden, while she was passing the ferryboat, from the Mohegan. How, then, could the several persons upon the Mohegan have concluded that it was the Haarlem lying still, while she was always going ahead, with her red light in constant view, and that No. 2 was going ahead, while, as a matter of fact, she either stopped or delayed to give the ferryboat the way, as was shown by the interception of her green light; and yet the persons on the Mohegan testified that the Transfer crossed the bow of the Mohegan at an interval of from 50 to 200 feet. This seems to the court to be an evidence of lack of watchfulness on the part of the Mohegan, or, if there was watchfulness, an error of judgment and seamanship not excusable. For the reasons that have been stated, the decree should be in favor of the libelant, with costs.